**Howard J. ZUCKERMAN et al.,
Plaintiffs,**

v.

**Ralph H. YOUNT et al., Defendants.**

**No. 71 C 1770.**

United States District Court,
N. D. Illinois, E. D.

Aug. 2, 1973.

---

Ralph A. Mantynband, Arvey, Hodes & Mantynband, Chicago, Ill., for plaintiffs.

Milton H. Cohen, W. Donald Mc-Sweeney and Robert T. Berendt, Schiff, Hardin, Waite, Dorschel & Britton, Harold M. Keele and Halbert O. Crews, Greenberg, Keele, Lunn & Aronberg, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

This matter is before the Court on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. The motion is denied.

The complaint alleges, *inter alia*, that Blackman, Ray & Zuckerman, Inc., wholly owned by Howard J. Zuckerman, Stuart N. Blackman and Joseph Ray, was formed for the purpose of conducting business as a broker-dealer in securities in interstate commerce. It is further alleged that plaintiffs introduced themselves to potential customers in various cities and on information it is alleged that some of these potential customers had previously done business with or were customers of defendants Morton Weinress, Leo Meiselman, David Y. Williams, and James C. Dougall, Jr. It is alleged that the defendants conspired to (1) restrain plaintiffs from securing said business by inducing the Midwest Stock Exchange ("Exchange") to postpone, delay and deny plaintiffs' membership on the Exchange and (2) prevent Stuart Blackman from functioning as a specialist on the Exchange.

It is also alleged that in furtherance of the conspiracy, the defendants caused false, derogatory and defamatory information concerning the plaintiffs to be brought to the attention of the Board of Governors, the Executive Committee and the Admissions Committee of the Exchange. As a result thereof, plaintiffs allegedly were prevented from obtaining full membership on the Exchange although they met all membership requirements. The Exchange is charged with furtherance of the conspiracy by its refusal to admit the plaintiffs to membership.

The action allegedly arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and jurisdiction allegedly exists pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

In support of their motion for summary judgment, defendants contend that (1) the plaintiffs have suffered no injury in their business or property as required by § 4 of the Clayton Act, since the Exchange offered to admit Mr. Blackman to membership subject to a six-month probationary period; (2) the alleged behavior of the defendants does not constitute a violation of the federal

antitrust laws since they acted pursuant to the Exchange's statutorily imposed duty of self-regulation and that, *pro tanto,* there is an implied waiver of the antitrust laws; and (3) in the alternative, the alleged behavior of the defendants does not constitute a violation of the antitrust laws under the rule of reason which is applicable here inasmuch as fair procedures were adhered to.

In light of this Court's disposition of the motion, only a brief statement of the facts is necessary. After Blackman's application was rejected by the Exchange's Executive Committee,[1] counsel for the Exchange gave Blackman notice of the information upon which the Executive Committee acted and informed him that he would be granted a hearing. It was charged that Blackman, while employed by Weinress & Co., (1) made several unnecessary and exaggerated requests to bid up for his own account a certain stock in which he was a co-specialist, in violation of Rule 9 of Article XXIV of the Midwest Rules; (2) failed to maintain an orderly market in the same common stock by reason of large spreads between bid and ask quotations and large gaps between successive sales;[2] (3) used "strong and offensive profanity" on the floor of the Exchange. It was also stated that "[t]he general opinion of members of the Committee on Floor Procedures is that during the period you [Blackman] were active on the Floor of the Exchange, you displayed a gross disregard for Exchange Rules, professional ethics and gentlemanlike behavior."

The Exchange's Executive Committee held a hearing on Blackman's application at which time witnesses with information adverse to Blackman were heard first. Blackman was given the opportunity to cross-examine these witnesses and present his own case. Blackman's counsel was not permitted to participate in the cross-examination, although counsel was allowed to be present to advise Blackman throughout the proceeding. The Exchange stipulated that the Executive Committee's decision on the application would be made solely on the basis of the evidence presented at the hearing.

The Executive Committee decided that the evidence was not sufficient to deny membership to Blackman. The minutes of the Executive Committee meeting of March 2, 1971 state, *inter alia,* that

"[t]he Committee finds that because of the serious questions that have been raised as to the knowledge and experience as well as the character and integrity of Mr. Blackman, he should be admitted to membership subject to a six month probationary period during which he would be under the active supervision of a member of the Floor Procedure Committee."

During the probationary period Blackman was to be able to operate without limitations, "except as may be found appropriate by the Floor Procedure Committee as a result of conduct on the Floor subsequent to his joining the Exchange. . . ."

When notified of the Executive Committee's action, Blackman considered it adverse and requested review by the Exchange's Board of Governors. The Board of Governors reviewed and unanimously affirmed the Executive Committee's action at its meeting of March 16, 1971. Blackman declined to accept this probationary membership and filed this suit.

### I.

█ Defendants contend that they are entitled to summary judgment since it is undisputed that the Exchange offered to admit Mr. Blackman to membership subject to a six-month proba-

---

1. Plaintiffs argue that this rejection was meant to be final, but it is unnecessary to decide whether a genuine issue of fact exists based on the materials submitted on the summary judgment motion.

2. He was specifically charged with selling a 50 share lot of the stock at 1⅝ above the last trade.

tionary period, and consequently injury which Blackman incurred, if any, resulted from his refusal to accept this offer. This contention rests on § 4 of the Clayton Act, 15 U.S.C. § 15, which requires that the plaintiff in a private antitrust action sustain injury in his business or property as a result of the alleged antitrust violation.

A party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact and supporting affidavits and other materials are to be viewed in the light most favorable to the opposing party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); First National Bank of Cincinnati v. Pepper, 454 F.2d 626, 629 (2d Cir. 1972). Furthermore, inferences which may be drawn from the underlying facts must be considered in the light most favorable to the party opposing the motion, United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed. 2d 176 (1962); Pitts v. Shell Oil Co., 463 F.2d 331, 335 (5th Cir. 1972), and summary judgment should not be granted where contradictory inferences may be drawn. United States v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1970).

Even though it is undisputed here that Blackman was offered probationary membership, summary judgment in defendants' favor is inappropriate since that underlying fact is subject to contradictory inferences with respect to possible injury. Defendants point out that Blackman, under the terms of the probationary membership, would have been given trading rights equal to those of other members. They also argue that every Exchange member is subject to supervision and discipline and that the restrictions that Blackman would have been subject to during the probationary period differed little from those of ordinary membership. By placing emphasis upon the relative scope of Blackman's powers and restrictions during the pro-

bationary period, defendants would have this Court conclude that no injury was suffered by him.

However, in the securities industry, where confidence in those with whom a person deals is critical, one who is granted only probationary status may find that status an obstacle to attracting business. Thus, in the area of ability to attract customers, it is conceivable that restriction to probationary membership might cause plaintiff the injury contemplated by § 4 of the Clayton Act.[3]

Commencing business would have involved risking considerable capital and Blackman is not required to maximize the damage that could be expected to result from the allegedly unlawful behavior. Cf. Fontana Aviation, Inc. v. Beech Aircraft Corp., 432 F.2d 1080, 1087 (7th Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826 (1971). The affidavits and other materials before the Court indicate that plaintiffs had the requisite "intention and preparedness" to engage in business as broker-dealers in securities. See N. W. Controls, Inc. v. Outboard Marine Corp., 333 F.Supp. 493, 506–507 (D.Del.1971) and cases cited therein.

To conclude that plaintiffs incurred no injury within the meaning of § 4 of the Clayton Act, this Court would be required to draw impermissible inferences in favor of defendants and against the plaintiffs. In short, defendants have not sustained their burden of demonstrating that there is no genuine issue on the fact of damage.

## II.

Defendants also argue in support of their motion for summary judgment that there has been an implied repeal of the antitrust laws, or in the alternative, that absent such a repeal, there has been no violation of the antitrust laws since the Exchange accorded Mr. Blackman procedural due process.

---

3. Under § 4 of the Clayton Act, a person need establish only *some* damage. Zenith Radio Corp. v. Hazeltine Research, Inc.,

395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

Defendants rely upon Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). That case is not dispositive of the issues here, however; the Supreme Court found it unnecessary to reach the instant problem because fair procedures— the "threshold of justification" for implied repeal of the antitrust laws—were not followed. *Silver, supra* at 365–366, 83 S.Ct. 1246. *Silver* does, however, provide some guidance here.

As in *Silver,* the acts alleged here would appear to constitute a *per se* violation of § 1 of the Sherman Act were they to have been committed in a context in which federal regulation was non-existent. Furthermore, control over membership is one of the responsibilities imposed on a stock exchange as part of its duty of self-regulation under § 6(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78f(b). In order to qualify for registration, the rules of an exchange must be "just and adequate to insure fair dealing and to protect investors", § 6(d) of the 1934 Act, 15 U.S.C. § 78f(d). Consequently, this Court must reconcile the objectives of the 1934 Act with those of the antitrust laws. *Silver, supra* at 357, 83 S. Ct. 1246.

*Silver* made clear that the 1934 Act contains no express exemption from the antitrust laws; that exemptions, if any, are only by implication; and that such implied exemptions are not favored. As stated at 357, 83 S.Ct. at 1257:

"Repeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary."

The Court also emphasized that under the 1934 Act, the Securities Exchange Commission does not have jurisdiction to review the application of exchange rules in circumstances such as exist here. With this in mind, it was noted at 358–360, 83 S.Ct. at 1258, that:

"[t]here is nothing built into the regulatory scheme which performs the antitrust function of insuring that an exchange will not in some cases apply its rules so as to do injury to competition which cannot be justified as furthering legitimate self-regulative ends. . . . Some form of review of exchange self-policing, whether by administrative agency or by the courts, is therefore not at all incompatible with the fulfillment of the aims of the Securities Exchange Act. . . . Since the antitrust laws serve, among other things, to protect competitive freedom, *i. e.,* the freedom of individual business units to compete unhindered by the group action of others, it follows that the antitrust laws are peculiarly appropriate as a check upon anticompetitive acts of exchanges which conflict with their duty to keep their operations and those of their members honest and viable. Applicability of the antitrust laws, therefore, rests on the need for vindication of their positive aim of insuring competitive freedom. Denial of their applicability would defeat the congressional policy reflected in the antitrust laws without serving the policy of the Securities Exchange Act. . . ."

In light of the fact that the antitrust laws are to be impliedly repealed only to the minimum extent necessary to make the 1934 Act work, this Court rejects defendants' contention that, based on the present record, there has been an implied repeal of the antitrust laws in this case. Blackman was charged with violation of certain Exchange rules. It appears that if the implied repeal of the antitrust laws is to be kept to the minimum, there must first be an inquiry as to whether the rules that were allegedly violated are essential enough to the operation of the 1934 Act that the anticompetitive impact that may result from their enforcement must be tolerated. In short, a preliminary question is whether the charges, if true, would justify anticompetitive restrictions on membership

in light of the purposes of the 1934 Act.[4]

This determination as to whether the particular rules are necessary to the operation of the 1934 Act appears to present a question of fact. Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264, 273 (7th Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971).[5]

■ There being no showing of an implied repeal of the antitrust laws, the Court turns to defendants' contention that because they accorded Blackman procedural due process, there is no violation of the antitrust laws. Plaintiffs do not challenge the procedure whereby their application was acted upon and it appears that such procedure is adequate under the circumstances. *Cf.* Crimmins v. American Stock Exchange, 346 F. Supp. 1256 (S.D.N.Y.1972). *Silver* teaches, however, that the granting of procedural due process does not remove the Exchange's action from scrutiny by an antitrust court: procedural due process is merely the threshold justification for exemption from the antitrust laws and having failed to grant fair procedures in *Silver,* the action of the New York Stock Exchange was treated as a *per se* violation of the Sherman Act.

Treating procedural due process as only a threshold question follows from the Court's recognition that (1) rules may be applied in particular circumstances so as to achieve anticompetitive results that cannot be justified by reference to the purposes of the 1934 Act, and (2) no mechanism exists for review by the Securities Exchange Commission or any other body.

The Supreme Court expected that a fair hearing itself would "help in effectuating antitrust policies by discouraging anticompetitive applications of exchange rules . . ." since unsupportable charges would be less likely and hearings would be conducted with an awareness of potential antitrust liability. *Silver, supra,* 373 U.S. at 362, 83 S. Ct. 1246, 1259, 10 L.Ed.2d 389.

■ Defendants argue that "[t]he result of nonliability under the antitrust laws obtains even if a court might disagree with a particular decision reached by a self-regulatory body." This Court agrees that if the self-regulatory scheme of the 1934 Act is to remain operable, antitrust courts must not substitute their judgment for that of a particular exchange. The Supreme Court in *Silver* did not reach this question, but Justice Goldberg seemed to suggest, at 366, 83 S.Ct. at 1261, that a choice would have to be made between various standards of review, including arbitrariness, good faith or reasonableness. The Antitrust Division of the Justice Department has taken the position with respect to disciplinary proceedings that as long as an exchange acts in *good faith* and follows fair procedures "antitrust liability would not turn upon whether an exchange had reached what a court subsequently determines to be the 'right' decision." Statement of the Department of Justice, Hearings on the Securities Industry Before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign

---

4. For example, Blackman was charged with the use of profanity on the Exchange floor. It appears that violation of Exchange rules on use of profanity is punishable by fine, which fine would have inconsequential anticompetitive effect, if any. Restricting membership for use of profanity, however, would have to be justified in terms of the purpose of the 1934 Act before there can be an implied repeal of the antitrust laws.

5. There the question was whether the anti-rebate rule of the New York Stock Exchange was exempt from the coverage of the Sherman Act. The court stated that factual evidence would have to be presented to show that the rule complained of was necessary to make the 1934 Act work.

**864**

Commerce, 92d Cong., 2d Sess., Serial No. 92–37e, pt. 6, at 3155 (1972). At the minimum this would seem to require that there be a foundation in the record for the action taken.

It is so ordered.