**Norman RICH et al., Plaintiffs,**

**v.**

**NEW YORK STOCK EXCHANGE et al., Defendants.**

**No. 73 Civ. 4642.**

United States District Court,
S. D. New York.

July 22, 1974.

---

Julien & Schlesinger, P. C. by Alfred S. Julien, Stuart A. Schlesinger and David Jaroslawicz, New York City, for plaintiffs.

Milbank, Tweed, Hadley & McCloy, by Russell E. Brooks, New York City, for New York Stock Exchange.

Rosenman Colin Kaye Petschek Freund & Emil, by Marvin G. Pickholz, New York City, for Ladenburg, Thalmann & Co.

### MEMORANDUM

BRIEANT, District Judge.

Early in the year 1973, Weis Securities, Inc. (hereinafter "Weis"), a mem-

ber firm of the New York Stock Exchange, (hereinafter the "Exchange" or "NYSE") was engulfed by financial difficulties. On May 24, 1973, when its condition appeared to be beyond salvation, the Securities Investors Protection Corporation ("SIPC") petitioned this Court, pursuant to the provisions of the Securities Investor Protection Act of 1970 for liquidation of Weis, and the appointment of a SIPC trustee. 15 U.S.C. § 78aaa et seq. The trustee was appointed on May 30, 1973 and proceeded immediately thereafter to resolve customer claims.

Plaintiffs were among 35,000 customers of Weis who, until May 24, 1973, were unaware and uninformed of Weis' impending demise. Institution of SIPC proceedings then deprived plaintiffs of access to or physical possession of their securities in Weis' possession, and the use of the capital these securities represented. This deprivation continued in most cases for at least several weeks, while the SIPC trustee performed his duties. Some customers, as is usual in such matters, never received all their securities in kind, although paid in cash to the limits of the protection provided under the SIPC provisions.

By this purported class action pursuant to Rule 23, F.R.Civ.P., plaintiffs seek damages for themselves and those similarly situated, from the Exchange, former officers and directors of Weis, and Ladenburg, Thalmann & Co. (hereinafter "Ladenburg"), a member NYSE firm.

Plaintiffs' second amended complaint alleges five causes of action, but upon analysis and consideration of the affidavits and memoranda submitted in their behalf, it appears that plaintiffs' claims are based on two theories only.

First, plaintiffs assert that the Exchange failed to discharge its duty imposed by section 6(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78f, to supervise and discipline Weis. This failure allegedly was the proximate cause of the SIPC liquidation, as a result of which they were damaged.[1] Second, plaintiffs assert that just prior to the liquidation, Weis, with the aid and acquiescence of the other defendants, transferred certain of its large and "privileged" margin accounts ("tippees") to other members of the Exchange, including defendant Ladenburg.

This action allegedly was also in violation of section 6(b) and section 10 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78f, 78j and Rule 10b–5 promulgated by the Securities and Exchange Commission (hereinafter "SEC").

In April 1973 several principals of Weis informed the Exchange that, for an unspecified period, the firm "may have" been "understating its profit and loss report to the Exchange by several million dollars." (Bishop deposition, p. 25). Defendants disclaim any prior actual knowledge by the Exchange that Weis faced financial difficulties. Plaintiffs come forward with no evidence to the contrary.

The Exchange immediately launched an intensive effort to study Weis' problems, and aid in improving its capital position, so that the firm would survive and customer safety would be assured. As a result of those efforts, a merger of Weis with Ladenburg was suggested. Weis accepted this suggestion and, in turn, proposed to the Exchange that, pending negotiations and consummation of the merger, it transfer some of its larger margin accounts to Ladenburg in order to effect an automatic and immediate improvement of its debt-capital ratio. This suggestion was approved by the Exchange, as a time tested technique of "restoring stability to financially troubled firms." (Defendants' brief, p.

---

1. The purposes of SIPC are to protect a class of investors from loss, without regard to the presence or absence of wrongdoing as a cause for broker-dealer insolvency. Accordingly, it is not surprising that this statute gives less complete relief than the securities laws give to those injured by tortious conduct.

9). According to the Exchange, Weis then unilaterally selected and transferred to Ladenburg those accounts with the largest debit balances.

■ Defendants oppose plaintiffs' motion for class action determination, and have moved for summary judgment pursuant to Rule 56, F.R.Civ.P. Defendants' summary judgment motion is based on the contention that plaintiffs have no provable damages. We need not reach this point. Obviously speculative, remote or conjectural damages cannot be recovered in an action under the securities laws. However, arguably, on the facts of this case, plaintiffs' right to immediate possession of certificates for their shares of stock, and their right to draw out their cash on demand were impaired by the unavoidable delay consequent on the activities of SIPC. If defendants by their tortious conduct produced this result, and if the damage was foreseeable, as it would be, it would seem plaintiffs could recover the traditional measure of damages for the wrongful distraint of a chattel, Chattanooga Discount Corp. v. West, 219 F. Supp. 140 (D.C.Ala.1963), or the wrongful failure to pay money when due.[2] But we need not reach this issue because, upon uncontested facts and evidence presented in the affidavits on this motion and the depositions, no cause of action exists in plaintiffs' favor.

Plaintiffs' first theory is based on defendant NYSE's alleged violations of section 6(b) of the Securities Exchange Act of 1934. Section 6(b), which provides for the registration of National Securities Exchanges with the SEC:

"No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this title or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade."

Section 6(b) further provides that one purpose of the rules and regulations enacted by the Exchanges is "to insure fair dealing and to protect investors." In addition, section 15A(b)(8) of the 1934 Act, 15 U.S.C. § 78o–3(b)(8) specifies that a national securities association may not register under the 1934 Act unless:

" . . . the rules of the association are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade . . . and, in general, to protect investors and the public interest . . . ."

Specifically, plaintiffs have argued that the Exchange failed to enforce Rule 325, its net capital rule, adopted in compliance with the aforementioned statutes. This Rule provides that the ratio of a member firm's aggregate indebtedness to its net capital may be no lower than 15 to 1. CCH, NYSE Guide, Vol. II, Rule 325.

■ A private right of action against the Exchange for failure to fulfill its statutory obligations may be founded on section 6(b). Baird v. Franklin, 141 F.

2. Stock certificates which are in such form as to constitute "good delivery" are negotiable, and the property is merged in the certificate. But a margin customer has no property or proprietary interest, under the usual account agreement, in any particular identifiable stock certificate in the hands of the broker. The most he has in the usual case is a chose in action against the stockbroker, to receive fungible shares forthwith upon payment and demand, or to direct a sale thereof and receive the net proceeds of sale upon the settlement date. Time of performance is of the essence. In a SIPC reorganization, a customer in the protected class, after the dust settles, will receive shares to the extent identifiable, or if not, then to the extent available in a marshalling of available shares against the firm's obligations, with the balance paid in cash value computed as of the date of the trusteeship. Such a customer has an involuntary partial conversion of his chose in action to cash, with attendant income tax consequences, and if he holds a round lot, he will probably receive an odd lot plus cash. SIPC provides no compensation for these situations, or the delay attendant upon the trustee's activities.

2d 238 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944).

In *Baird*, plaintiff alleged that the defendant New York Stock Exchange firm converted its securities and that it suffered damages as a result of the Exchange's failure to take disciplinary action against the member firm. Holding that there is "no substantial resemblance between the duties of bailees or other fiduciaries and those of the Stock Exchange," the Second Circuit concluded that the Exchange was under a statutory duty, giving rise to a private claim for damages arising from its breach, "to investigate the dealings and the financial conditions of the members and to suspend or expel members who it had reason to believe had been guilty of conduct inconsistent with just and equitable principles of trade." 141 F.2d at p. 239.

■ The duty of the Exchange under section 6 to enforce compliance with its rules "so far as within its powers" must be evaluated reasonably. The Exchange has 579 member organizations, which employ approximately 56,000 registered representatives. Marbury Management, Inc. v. Kohn, 373 F.Supp. 140 (S.D.N.Y. 1974); Butterman v. Walston & Co., 387 F.2d 822 (7th Cir. 1967), cert. denied 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968). The Exchange's supervision need not be "fluoroscopic," and liability should not be imposed on the Exchange merely because a violation of its rules escaped its detection. Hochfelder v. Midwest Stock Exchange, 350 F.Supp. 1122, 1125 (S.D.Ill.1972). Liability should attach only if plaintiff demonstrates that the Exchange had reason to believe or suspect that a member firm was in violation of the rules, and then failed or refused to take remedial action, which failure to act resulted in an injury to the plaintiff. Steinberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., CCH Fed.Sec.L.Rep. ¶ 94,599 (S.D.N.Y. June 14, 1974); Marbury Management, Inc. v. Kohn, *supra*; Baird v. Franklin, *supra*. No sheriff can prevent all felonies in his bailiwick, and the law does not so require.

It was held in Colonial Realty Corp. v. Bache & Co., 358 F.2d 178, 182 (2d Cir.), cert. denied 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), that the question of

"whether the courts are to imply federal civil liability for violation of exchange or dealer association rules by a member cannot be determined on [an] all-or-nothing basis . . . rather, the court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation."

Since the Court in *Colonial* declined to adopt a *per se* rule with regard to the violation of Exchange rules, our research has revealed no decision which has upheld a complaint based on such a claim unless the complaint also contained sufficient allegations of fraud. See Starkman v. Seroussi, 377 F.Supp. 518 (S.D.N.Y.1974); Schonheltz v. American Stock Exchange, 376 F.Supp. 1089 (S.D.N.Y.1974).

■ For purposes of this decision only, we shall assume that a private cause of action may in the circumstances of this case be founded on section 6, arising out of a negligent or wilfull failure to enforce Rule 325. However, measured against the standards established by the recent cases, plaintiffs' evidence fails to support a claim against the Exchange or Ladenburg based either on section 6 or Rule 10b–5.

From the affidavits and briefs submitted in support of defendants' motion for summary judgment it appears that the Exchange had no notice, and, through the exercise of reasonable diligence, did not and could not have learned prior to mid-April 1973 that Weis was in violation of the Exchange's capital requirements. (See deposition of Mr. Robert Bishop, pp. 11 and 24. Mr. Bishop, Senior Vice President of the Exchange, testified that in 1973 he was in charge of a staff of over 300 people

who were responsible for enforcing compliance with Rule 325).

Plaintiffs have not alleged that the Exchange had actual knowledge of Weis' financial difficulties prior to mid-April 1973, nor do they allege any facts upon which we could find that the Exchange in the exercise of due diligence should have known prior to that time. In fact, careful examination of the second amended complaint reveals that plaintiffs base their claims only on defendants' actions after actual discovery of Weis' difficulties.

From the time the Exchange received notice of Weis' difficulties it acted with dispatch to discharge its statutory duties. The Exchange first conducted an intensive investigation and then approved a plan which called for a merger with Ladenburg, a stronger firm, preceded *pendente* by a transfer of some accounts from Weis to Ladenburg.[3] The Exchange did not select the accounts to be transferred. Its procedure was in accordance with practices the SEC has acknowledged to be a proper and effective means of salvaging firms facing financial ruin. Had it been successful, no customers of Weis would have been damaged or inconvenienced in any way.

The Director of the SEC's Division of Market Regulation wrote to the Hon. John W. Wydler, Member of Congress, under date of January 25, 1974:

"It is an accepted practice when a broker-dealer is approaching financial difficulty for . . . self-regulatory organizations, including the NYSE, to undertake various measures in an effort to place the broker-dealer in a

stronger financial posture and to thereby limit overall customer exposure. Such efforts frequently result in the merger, rehabilitation or, if necessary, self-liquidation of the broker-dealer without loss to customers and without the delay and inconvenience which may attend a forced liquidation under the SIPC Act. One step often taken to improve a broker-dealer's financial posture is to reduce the firm's liabilities, and accordingly, reduce the amount of capital required to support these liabilities.

\* \* \* \* \* \*

One possible avenue for reducing a firm's net capital ratio is to reduce the amount of bank borrowings collateralized by customers' margin securities thus reducing aggregate indebtedness which in turn effects a lower net capital ratio.

In order to reduce bank borrowings collateralized by customers' margin securities, customers' accounts with debit balances are delivered to other broker-dealers who are willing to assume responsibility for such accounts.

·  ·  ·

The NYSE advises us that they concurred in Weis' decision to deliver accounts in this manner. . . . The Exchange states that they gave their approval 'to reduce the firm's liabilities and to ensure continued safety for all customers not to afford favored treatment to any specific group.' The Commission is not aware of facts indicating a different motivation . . . .

---

3. We are told on argument that as a practical matter Ladenburg received no financial benefit as a result of these transfers. Conditions in Weis' cage and back office were somewhat chaotic. In most cases, all that was physically delivered to Ladenburg prior to the appointment of the SIPC trustee were "due bills" for the stocks represented by the accounts of these large margin customers. Ladenburg by accepting the accounts, assumed responsibility to deliver the stocks upon payment of the margin debts, and paid to Weis or its creditors in cash or equivalent, the amount of money represented by the net margin debt in the accounts transferred. This had the automatic effect of decreasing Weis' liabilities by the amount of the margin indebtedness of the accounts transferred; and, to the extent that the due bills were not honored, or that there was delay in honoring them, Ladenburg, by placing itself in a position of liability towards these transferred customers, formerly occupied by Weis, suffered damages in some significant but unknown amount. It is not suggested that Ladenburg actually profited as a result of these transfers, nor that Ladenburg's profit was of any concern to the defendant Exchange, or any motivation in the procedure followed.

\*   \*   \*   \*   \*   \*

While these efforts to unwind the affairs of Weis without resort to a SIPC liquidation were unsuccessful, such efforts in other instances appear to have been successful in avoiding forced liquidations of broker-dealers and the disruption inherent in such liquidation proceedings."

In addition, NYSE Rule 326(b) requires that a member firm reduce its business as it approaches a point where it might be in violation of the capital requirements of NYSE Rule 325. Counsel for the Exchange notified the Court by letter dated May 21, 1974 that, "such a reduction occurred in respect to Weis through the here challenged transfer of some of Weis' margin accounts to Ladenberg (sic)."

The Exchange is required by section 6 to enforce "so far as within its powers" those of its rules which are designed to insure conduct consistent with "just and equitable principles of trade." The Exchange's efforts to aid Weis did not constitute a failure to fulfill its obligations. Ladenburg, by accepting margin accounts from Weis, did not conspire with the Exchange to breach its obligation under section 6, nor did Ladenburg breach any independent duty.

■ Plaintiffs suggest, inferentially, that the rules of the Exchange were inadequate or unsuited to meet the problems Weis encountered, and that somehow, the Exchange should have acted differently. However, while section 6 might provide a remedy for the Exchange's failure to enforce its net capital rule, it does not support an action against the Exchange for failure to enact better or more stringent rules. Citizens, such as plaintiffs may apply to the SEC to alter or supplement the rules of the Exchange pursuant to section 19(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78s(b). Marbury Management, Inc. v. Kohn, 373 F.Supp. 140 (S.D.N.Y.1974); Kroese v. New York Stock Exchange, 227 F.Supp. 519, 521 (S.D.N.Y.1964).

■ Moreover, plaintiffs have failed to state a claim based on Rule 10b–5 against the Exchange and Ladenburg. Plaintiffs have failed to plead scienter as is required in claims based on Rule 10b–5, and have proffered no evidence on this motion, of any scienter. Segal v. Gordon, 467 F.2d 602 (2d Cir. 1972); Shemtob v. Shearson, Hammil & Co., 448 F.2d 442 (2d Cir. 1971).

It is conceded that certain large margin accounts were transferred from Weis to Ladenburg. This action was taken pursuant to practices and methods which the SEC has acknowledged to be an effective means to remedy Weis' problems while protecting the public interest. There is no evidence to support any reasonable inference to the contrary.

The claims plaintiffs have alleged against Weis, and its directors and officers, are based on the same theories and facts as those claims alleged against Ladenburg and NYSE. For the same reasons, we conclude that plaintiffs have no claim against Weis or these additional defendants, on the uncontested facts.

■■ Additionally, plaintiffs cannot recover because the alleged misconduct of the defendants, for which no supportive evidence was offered, was not the proximate cause of the damage. When NYSE and Ladenburg came upon the scene, Weis was already moribund. It had concealed from NYSE, by filing incorrect statements, the fact of its capital impairment. Even if, in defiance of reality, we call the "privileged accounts" which were transferred to Ladenburg "tippees", who evaded the delay and inconvenience of the SIPC reorganization through inside information, there is no reason to believe that the transfer of these accounts hastened or increased the damage to those not "tipped", plaintiffs here. There is no right to share in improperly released information. Levine v. Seilon, Inc., 439 F.2d 328, 334–335 (2d Cir. 1971). If some were caused to leave the sinking ship in time, this breach of duty, if it was one, neither caused not exacerbated the injuries here complained of. Indeed, to the extent it helped Weis' finances, it may have expedited the SIPC reorganization, and mitigated the damage

and inconvenience to Weis' other customers.

Under the circumstances of this case, and upon the undisputed evidence now before the Court, it is appropriate that summary judgment be granted as well to the non-moving parties. See J. Moore, Federal Practice, ¶ 56.12. However, our determination is without prejudice to the different factual claims of plaintiffs asserted in the related case of Rich v. Touche Ross & Co., 74 Civ. 772–CLB. Those claims concern Weis' actions, and those of its officers, directors and accountants, between January 1971 and May 1973. Plaintiffs allege in that action that it was during that period Weis failed to keep complete and accurate financial records, and Touche Ross & Co. failed to perform its duties properly as certified public accountants in auditing the purportedly false statements of net capital filed with NYSE hereinbefore mentioned.

For the reasons herein set forth, summary judgment is granted, and the complaint is dismissed as to all defendants. The motion to declare a class action is denied as moot.

Settle a final Judgment on notice.