**J. R. WILLISTON & BEANE, INC.,**
**Plaintiff,**

v.

**Robert W. HAACK, as President of the New York Stock Exchange, et al.,**
**Defendants.**

**No. 67 Civ. 4556 (WCC).**

United States District Court,
S. D. New York.

Dec. 23, 1974.

Ronald H. Alenstein, New York City, of counsel, Shea, Gould, Climenko & Kramer, New York City, for plaintiff.

John J. Loflin, New York City, and Deborah G. Steinberg, of counsel, Lord, Day & Lord, New York City, for American Stock Exchange.

Stephen M. Axinn and Michael H. Diamond, New York City, of counsel, Skadden, Arps, Slate, Meagher & Flom, New York City, for OTC Clearing Corp.

Russell E. Brooks and Andrew J. Connick, New York City, of counsel, Milbank, Tweed, Hadley & McCloy, New York City, for New York Stock Exchange.

Lawrence E. Nerheim, Gen. Counsel, David Ferber, Sol., Richard E. Nathan, Asst. Gen. Counsel, David K. Ginn, Atty., SEC, Washington, D. C., amicus curiae.

1. National OTC Clearing Corporation is now known as National Clearing Corporation as a result of a 1971 merger between it and National Clearing Corporation.

2. The "collateral" securing the Allied futures account turned out to be nonexistent. The storage tanks that were supposed to contain 1.8 billion pounds of salad oil turned out to be substantially empty of such oil. The event, which resulted in widespread financial disaster, came to be widely known as the "Salad Oil" scandal.

## OPINION AND ORDER

CONNER, District Judge:

J. R. Williston & Beane, Inc. ("W & B") brought this action pursuant to Section 1 of the Sherman Act (15 U.S.C. § 1) to recover the damages allegedly sustained by it when it was temporarily suspended from membership on The New York Stock Exchange ("NYSE") and The American Stock Exchange ("ASE"), and when Stock Clearing Corporation, The American Stock Exchange Clearing Corporation and National OTC Clearing Corporation [1] ("Clearing Corporations") cease dealing with it.

The relevant facts are largely undisputed. However, in order to render the nature of the alleged antitrust violations understandable, it is necessary to review the factual background in considerable detail.

### I.

In 1963 and prior thereto, W & B was a broker-dealer registered with the Securities and Exchange Commission ("SEC") pursuant to Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). During this time, Allied Crude Vegetable Oil Refining Corporation ("Allied") maintained a margin account in soybean oil and cottonseed oil futures, as well as a "spot oil" account with W & B. The accounts were collateralized by warehouse receipts held by W & B and believed to be worth about $1,800,000.[2]

In November, 1963, the market price of commodity futures contracts dropped sharply.[3] Accordingly, W & B made

3. An article in the now defunct New York Herald Tribune, dated November 20, 1963, reported that on Friday, November 15, soybean oil futures were down 23 to 36 points; on Monday, November 18, they fell another 89 to 145 points under heavy selling; and on Tuesday, November 19, they dropped 25–133 points more.

The article stated that the action in cottonseed oil was similar. On November 15 that commodity fell 14 to 20 points, by the 18th another 92 to 110 points and on the 19th still another 25 points.

margin calls on Allied totalling $610,000. Although Allied delivered a check for $610,000 on November 19, the check was dishonored and these calls were never met.

The NYSE was aware that W & B carried a very large commodities account for Allied because it had been monitoring that account for a substantial period of time. Consequently, when it learned that Allied had failed to meet margin calls from another member firm (Ira Haupt & Co.), it sent an examiner on the 19th to review W & B's books in order to determine the extent to which recent events had adversely affected W & B's ability to comply with the Exchange's net capital rules. The examiner determined that W & B had a negative capital position of $1,263,045. While he was there, he also learned of the default on the Allied check; later that afternoon it was learned that Allied had filed a petition for an arrangement under Chapter XI of the Bankruptcy Act.

On the evening of November 19, 1963, Alpheus C. Beane ("Beane"), chief executive officer of W & B, discussed the problem of the Allied bankruptcy with NYSE officials. Beane was informed at that time that the question of the Allied bankruptcy would be the subject of a special meeting of the Board of Governors of the NYSE that would be held the following morning.

Prior to the commencement of trading on November 20, the Board of Governors of the NYSE met. Beane and the chief operations officer of W & B were not present at the meeting, but waited in an adjacent room. The meeting extended past the opening of trading and W & B kept its brokers off the floor pending further notice from the Board. Thereafter, the Board informed W & B that it had been suspended as an Exchange member corporation pursuant to Article XIII, Section 2 of the NYSE's constitution.

Shortly thereafter, the ASE suspended W & B as a member, and the Clearing Corporations ceased acting for it.

During the time of its suspension, W & B was permitted to continue handling business for its customers by arranging for Shields & Co. to clear transactions for it. Throughout this time, W & B was making arrangements to obtain the funds (in excess of $500,000) necessary to comply with the requirements of the NYSE's net capital rule.[4] By November 22, 1963, W & B had raised more than the minimum amount required, and was reinstated as a member of the NYSE pursuant to Article XIII, Section 5 of the NYSE's constitution and as a member of the ASE by act of a Special Committee. The Clearing Corporations reinstated W & B shortly thereafter. However, on November 26, W & B announced the termination of its business and liquidated its assets in December, 1963.

## II.

On November 17, 1967,[5] W & B instituted the present action, claiming that it was arbitrarily suspended without proper notice and an opportunity to be heard.

W & B further claims that defendants acted in contravention of their constitutions, charters and by-laws, and that their actions constituted a boycott in violation of the Sherman Act. W & B asserts that the action of defendants destroyed its reputation, caused the public to lose confidence in it and forced it to liquidate its business at a substantial loss.

Seven years after the commencement of this action, defendants have moved for summary judgment, and these motions are presently before the Court.

Defendants NYSE and ASE claim that W & B was suspended pursuant to

---

4. Rule 325(a) of the NYSE prohibited any member corporation from allowing its indebtedness to exceed 2,000 percent of its net capital. Rule 467 of the ASE is to the same effect.

5. W & B instituted this action three days before the statute of limitations was to run.

their duty to protect the investing public and that they are constitutionally required to suspend a member who is in such financial condition that it cannot be permitted to continue in business with safety to its creditors and the exchange. NYSE Constitution Art. XIII, Section 2; ASE Constitution Art. V, Section 3(b).

The ASE further contends that when, on the morning of November 20, the NYSE revealed that W & B had been suspended due to a serious impairment of the firm's net capital, representatives of the ASE attempted to contact responsible officials at W & B, but were un-

successful. The ASE argues that W & B's failure to notify the ASE of the substantial impairment of its net capital position was a violation of ASE Rule 467, governing net capital requirements for member corporations.

The Exchanges assert that, in view of the exigency of the circumstances, notice and a formal hearing were not required as a prerequisite to suspending W & B, and that their conduct was mandated by Section 6 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78f,[6] and their respective Constitutions and Rules.[7]

**6.** 15 U.S.C. § 78f(b) provides that registration of an exchange (with the Securities and Exchange Commission as a national exchange) cannot be granted or remain in force "unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade . . . ."

The Supreme Court in Silver v. New York Stock Exchange, 373 U.S. 341, 353, 83 S.Ct. 1246, 1255, 10 L.Ed.2d 389 (1963) held:

"[T]he general requirement of § 6(d) [15 U.S.C. § 78f(d)] that an exchange's rules be 'just and adequate to insure fair dealing and to protect investors' has obvious relevance to the area of rules regulating the conduct of an exchange's members."

**7.** NYSE Constitution, Article XIII, Section 2 provided:

"Whenever it shall appear to the Chairman of the Board that a member firm or member corporation has failed to meet its engagements, or is insolvent, or the Chairman of the Board has been advised by the Board of Governors or by the Board of Directors of Stock Clearing Corporation that such member firm or member corporation is in such financial condition that it cannot be permitted to continue in business with safety to its creditors or the Exchange, prompt notice thereof shall be given to the Exchange. Such member firm or member corporation shall thereby become suspended as a member firm or as a member corporation and every member or allied member who is a general partner or holder of voting stock therein shall thereby become suspended from membership or allied membership, until after settlement has been made with his creditors and the creditors of such firm or corporation, the members have been reinstated

and the suspensions of the allied members and the firm or corporation have been terminated by the Board of Governors."

NYSE Rule 325(a) provided:

"No member or member organization doing any business with others than members or member organizations or doing a general business with the public, except a member or member organization subject to supervision by State or Federal banking authorities, shall permit, in the ordinary course of business as a broker, his or its Aggregate Indebtedness to exceed 2000 per centum of his or its Net Capital, . . . ."

ASE Constitution Article V, Section 3(b) provided:

"Suspension by Chairman

(b) Whenever it shall appear to the President that a member or a member firm or a member corporation has failed to meet his or its engagements or is insolvent, or the President has been advised by the Advisory Committee or the Executive Committee of American Stock Exchange Clearing Corporation that such member or firm or corporation is, in its opinion, in such financial condition that he or it cannot be permitted to continue in business with safety to his or its creditors or the Exchange, the President shall request the Chairman of the Board to announce to the Exchange the suspension of such member and his firm or corporation, which suspension shall continue until the member has been reinstated."

ASE Rule 467 provided:

"No member corporation doing any business with others than members, member firms or member corporations or doing a general business with the public, except a member corporation subject to supervision by State or Federal banking authorities, shall permit in the ordinary course of business as a broker, its aggregate indebt-

In any event, the Exchanges argue that under the prevailing case law, the action which they took is not subject to review under the antitrust laws.

The Clearing Corporations assert that suspension by the Exchanges required them, pursuant to their By-Laws and Rules,[8] to cease acting for W & B.

### III.

The test for determining the extent to which the securities exchanges are immune from antitrust liability was first formulated in Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

In *Silver*, the Supreme Court ruled that the New York Stock Exchange could not summarily order the removal of the private wire connections which petitioners, over-the-counter broker-dealers, had to member offices.

In response to the NYSE's claim that it was immune from antitrust regulation, the Court noted that the Securities Exchange Act contains no express exemption from the antitrust laws, and that repeals by implication are not favored. The Court further noted that particular instances of exchange self-

regulation which fall within the scope and purpose of the Securities Exchange Act may be regarded as justified, although, absent sanction by the Act, they would be considered unreasonable. 373 U.S. at 360–361, 83 S.Ct. 1246.

The *Silver* Court, however, did not attempt to determine whether the actions of the NYSE were within the scope of the "great purposes of the Securities Exchange Act," 373 U.S. at 359, 83 S.Ct. at 1258, and therefore immune from the antitrust laws. The Court ruled that under the circumstances the petitioners were clearly entitled to notice and an opportunity to be heard and that the NYSE's actions, therefore, constituted a *per se* violation of the antitrust laws.

The question of stock exchange antitrust immunity was recently considered by our Court of Appeals in Gordon v. New York Stock Exchange,[9] 498 F.2d 1303 (2d Cir. 1974), cert. granted, 419 U.S. 1018, 95 S.Ct. 491, 42 L.Ed.2d 291 (1974). The Court stated that,

> "governmental oversight of the fixing of commission rates, vested expressly in the SEC pursuant to § 19(b)(9) of the 1934 Act, 15 U.S.C. § 78s(b)(9) (1970) . . . [presented] that

edness to all other persons to exceed 2000 per centum of its net capital.

＊　　＊　　＊　　＊　　＊

"Each member corporation shall promptly notify the Exchange if the net capital of the member corporation does not equal or exceed the minimums required by this rule . . . ."

8. Article V, Section 1 of Stock Clearing Corporation's By-Laws and Article VII, Section 1 of the ASE Clearing Corporation's By-Laws, permit those organizations, in their discretion, to cease acting for a clearing member. Stock Clearing Corporation's Rule 16, and ASE Clearing Corporation's Rule 17 provided that those organizations had to cease acting for any clearing member suspended pursuant to the respective Constitutions [NYSE Art. XIII, Section 2, ASE Art. V, Section 3] of their parent bodies.

National OTC Clearing Corporation's Rule 114 required that organization to cease acting for any clearing member against whom any national securities exchange has instituted a proceeding to determine whether there has been a violation of any rule requiring

the maintenance of a special minimum net capital or net capital ratio.

9. The extent of antitrust immunity for stock exchanges is as yet unsettled. See, e. g., Gordon v. New York Stock Exchange, 498 F.2d 1303 (2d Cir. 1974), cert. granted, 419 U.S. 1018, 95 S.Ct. 491, 42 L.Ed.2d 291 (1974) ; Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970) ; Abbott Securities Corp. v. New York Stock Exchange, 384 F.Supp. 668 (D.D.C. 1974) ; Fredrickson v. Merrill Lynch, Pierce, Fenner & Smith, 389 F.Supp. 1151 (N.D. Ill.1974). See also Brief for the United States as Amicus Curiae filed in Gordon v. New York Stock Exchange, supra ; Statement of the Antitrust Division of the Department of Justice submitted in Hearings Before the Subcomm. on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, 92d Cong., 2d Sess., Study of the Securities Industry, pt. 6, at 3154–3156 (1972) ("House Study") ; memorandum of the Securities and Exchange Commission as Amicus Curiae submitted in the present action ("SEC Memo").

'different case' . . ." 498 F.2d at 1305

which the *Silver* Court recognized would exist if the exchange practice allegedly violative of the antitrust laws were subject to control by the SEC.

The Court further stated that those matters which the *Silver* Court referred to as fundamental to achieving "the aims of the Securities Exchange Act," 373 U.S. at 361, 83 S.Ct. at 1259, and thus immune from the application of the antitrust laws, must be those twelve areas enumerated in Section 19(b), 15 U.S.C. § 78s(b), as to which the SEC has authority to determine whether the exchange's rules and regulations assure achievement of the goals of the Securities Exchange Act. 498 F.2d at 1306.

Thus, the Court concluded that the courts simply do not have jurisdiction to entertain Sherman Act claims as to commission rate-fixing.

Although neither *Silver* nor *Gordon* is precisely in point, these cases do provide the guidance necessary to determine the important issue presented by this case.

## IV.

It is now well settled that repeal of the antitrust laws is to be implied only to the minimum extent necessary to make the Securities Exchange Act work. Merrill Lynch, Pierce, Fenner & Smith v. Ware, 414 U.S. 117, 127, 94 S. Ct. 383, 38 L.Ed.2d 348 (1973); *Silver, supra* 373 U.S. at 357, 83 S.Ct. 1246, 10 L.Ed.2d 389; Gordon v. New York Stock Exchange, *supra* 498 F.2d at 1305–1306.

Therefore, in order to determine the circumstances in which there is immunity from the antitrust laws, it is necessary to examine the history and purposes of the Securities Exchange Act.

Exchanges were initially treated by the courts as private clubs, and given great latitude in disciplining their members. *Silver, supra* 373 U.S. at 351, 83

S.Ct. 1246. However, as the exchanges became a vital element in the nation's economic system, some form of regulation became necessary.[10] The importance of the securities industry to our economy led to the enactment of the Securities Exchange Act of 1934. The purpose of the Act, however, was not to assume control of the industry, but, as stated by Mr. Justice Douglas when he was Chairman of the SEC, to:

> "[let] the exchanges take the leadership with Government playing a residual role. Government would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with the hope it would never have to be used." Douglas, Democracy and Finance 82 (Allen ed. 1940).

See *Silver, supra* at 352, 83 S.Ct. 1246.

Thus, the responsibility for enacting and enforcing regulations pertaining to the governance of their affairs, was to remain with the exchanges. Rather than vesting the Securities and Exchange Commission with the power to monitor specific instances of abuse, the Act required the exchanges to register with the Commission, Section 5, 15 U.S. C. § 78e, and decreed that registration would not be granted unless the Commission was satisfied that the exchange's rules and regulations were "just and adequate to insure fair dealing and to protect investors," Section 6(d), 15 U.S.C. § 78f(d). Moreover, registration would not be granted and could not remain in force,

> "unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade . . .." Section 6(b), 15 U. S.C. § 78f(b).

Pursuant to this mandate, the NYSE and ASE adopted as part of their Constitutions the provision that any member which is in such financial condition that

---

10. Silver v. New York Stock Exchange, *supra* note 6 at 351, 83 S.Ct. 1246; Dawidoff, The Power of the Securities and Exchange Commission to Require Stock Exchanges to Discipline Members, 41 Ford.L.Rev. 549, 550–551 (1973).

it cannot be permitted to continue in business with safety to its creditors or the exchange shall be suspended. NYSE Constitution, Art. XIII, Section 2; ASE Constitution, Art. V, Section 361.

W & B does not dispute the propriety of suspension of a member who cannot satisfy this requirement, but contends that this provision was not applied in its case, but that it was suspended instead for a violation of the net capital requirement, as to which there is no provision for suspension. It concedes that a severe capital impairment might constitute a "financial condition" appropriate for suspension, but asserts that its capital position did not place it in such condition.

In order to rule on W & B's contentions, it is necessary to determine whether the unquestionably anticompetitive action on the part of the Exchanges, may be "justified as furthering legitimate self-regulative ends." *Silver, supra* at 358, 83 S.Ct. at 1258; Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, *supra* 414 U.S. at 126–127, 94 S. Ct. 383; Zuckerman v. Yount, 362 F. Supp. 858, 862 (N.D.Ill.1973).

Section 19(b) of the Securities Exchange Act, 15 U.S.C. § 78s(b), enumerates those matters fundamental to fostering the goals of the Securities Exchange Act. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, *supra,* 414 U.S. at 134, 94 S.Ct. 383; Gordon v. New York Stock Exchange, *supra* 498 F.2d at 1306. Of prime concern to Congress is the SEC's ability to require that the exchanges provide adequate safeguards "in respect of the financial responsibility of members." Section 19 (b), 15 U.S.C. § 78s(b).

The NYSE and ASE net capital rule is clearly such a rule.[11] The purpose of the net capital rule is to assure the financial responsibility of broker-dealers by limiting the ratio of their "aggregate indebtedness" to their "net capital." In response to a series of questions posed by the Securities Industry Study of the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs, to the SEC, the Securities Investor Protection Corp., and the NYSE, it was stated:

> "Violation of the [net capital] rule has always been regarded as meaning that there is an immediate threat to customers of the broker-dealer and to others with whom he deals which must be immediately rectified. The threats posed by continued violation of the net capital rule can be analogized to the prospective danger of a bank insolvency."[12]

In Securities and Exchange Commission v. General Securities Co., 216 F. Supp. 350, 351 (S.D.N.Y.1963), the Court stated:

> "The net capital rule is one of the important protections for the investing public and its enforcement, of course, should never depend on whether actual loss has in fact already occurred. *The chief value of the rule lies in the prevention of loss to the public* (emphasis added).

See Blaise D'Antoni & Associates, Inc. v. Securities and Exchange Commission, 289 F.2d 276, 277 (5th Cir. 1961). Furthermore, the 1963 Special Study of the Securities Markets found that the NYSE regarded its net capital rule as being of fundamental importance in assuring member financial responsibility. In fact, the record established by the NYSE up to the end of 1963 caused the SEC to find the NYSE's net capital enforcement program to be a model of self-regulation.[13]

The importance of the net capital rule is further emphasized by the fact that members of national securities exchanges are exempted from the SEC's net capital rule, Section 8(b), 15 U.S.C.

11. *Supra* note 4.

12. Hearings Before the Subcomm. on Securities of the Senate Committee on Banking, Housing and Urban Affairs, 92d Cong., 2d Sess., Securities Industry Study, pt. 4, at 334 (1972) ("Senate Study").

13. Id. at 220–221.

§ 78h(b), only when, in the SEC's view, "rules, settled practices and applicable regulatory procedures" of the exchanges "are deemed . . . to impose requirements more comprehensive than the requirements of" the Commission's rule. Rule 15c3–1(b)(2), 17 CFR 240. 15c3–1(b)(2). Both the NYSE and ASE have been exempted from the SEC's rule from its inception.

The SEC has stated that,

"a broker-dealer who is not in compliance with net capital requirements must be prevented, as promptly as possible, from conducting any further business, and placing any more investors in financial jeopardy, until its net capital deficiency has been remedied" [14]

Even the Antitrust Division of the Justice Department, which is, as a general proposition, opposed to antitrust immunity for the exchanges,[15] publicly stated that disciplining a member for violation of net capital rules cannot subject an exchange to antitrust liability "if its disciplinary proceedings were fair and its decision based upon sufficient evidence received in its proceeding." [16]

This brings us to the second prong of W & B's complaint. W & B contends that it was denied the procedural safeguards necessary to justify the decision to suspend it as a member of the Exchanges. In this respect it asserts that it had neither notice nor a hearing before it was suspended, and was thus denied the opportunity to controvert the charges against it.

It is beyond dispute that W & B was not present and that it had no opportunity to be heard at the meeting of the Board of Governors. It is also undisputed, however, that the size of W & B's commodities account with Allied was of concern to the NYSE for a substantial period of time prior to the events in question. Thus, in view of the precipitous drop in the futures market,[17] and the knowledge that another member firm was in dangerous financial condition because of defaults on the part of Allied, the NYSE dispatched an examiner to review W & B's books and records to determine its net capital position. At that time, the examiner determined that W & B was in violation of the net capital rule. It was also learned that an Allied check for $610,000 was refused certification and that Allied had filed a petition for an arrangement under Chapter XI of the Bankruptcy Act.

By the morning of November 20, an article appeared in the New York Herald Tribune exclaiming that the

"bankruptcy of a big New Jersey commodity speculator sent a tidal wave across the Hudson last night, causing two New York brokerage firms [Ira Haupt & Co. and J. R. Williston & Beane, Inc.] to worry about raising enough capital to stay in business as member firms of the stock exchange."

It seems evident that a "general atmosphere of crisis" did prevail.

Moreover, Beane admitted (Dep. 234) that he was aware on the 19th that the problem would be presented to the Board of Governors the next day; that he was aware that suspension was a possibility (Dep. 262); that the "liquidation of the Allied accounts would have a very serious impact on" W & B's net capital (Dep. 233); that W & B was outside the required net capital ratio; and that a "substantial" amount, i. e., over a half million dollars, would have to be raised in order to comply with the net capital rule (Dep. 264; 286–287).

Thus, the question is reduced to whether, under the circumstances, the Exchanges accorded W & B the "rudiments of fairness" prerequisite to the exercise of their essential self-regulatory

---

14. SEC memo, *supra* note 9 at 23.

15. SEC Hearings on the Structure, Operation and Regulation of the Securities Markets, House Study, *supra* note 9 at 3155–3156. See also Brief for the United States as Amicus Curiae filed in Gordon v. New York Stock Exchange, *supra* note 9.

16. House Study, *supra* note 9 at 3155.

17. *Supra* note 3.

power of suspension. Sloan v. New York Stock Exchange, Inc., 489 F.2d 1, 4 (2d Cir. 1973).. See also the opinion of the District Court, 348 F.Supp. 1185, 1192 n. 6 (S.D.N.Y.1972).

▪ Although it is clear that fair procedure is necessary for an implied repeal of the antitrust laws, *Silver, supra,* 373 U.S. at 364–365, 83 S.Ct. 1246, 10 L.Ed.2d 389; Zuckerman v. Yount, *supra,* 362 F.Supp. at 862; see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, *supra,* 414 U.S. at 126, 94 S.Ct. 383, 38 L.Ed.2d 348; Cowen v. New York Stock Exchange, 371 F.2d 661, 663 (2d Cir. 1967), what constitutes fair procedure is a function of time and circumstances.[18] Cafeteria Workers v. McElroy, 367 U.S. 886, 894–895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Intercontinental Industries, Inc. v. American Stock Exchange, 452 F.2d 935, 941 (5th Cir.).

▪ It is beyond speculation that exchanges must be given broad discretion in making the crucial determination as to whether the continued membership of a broker-dealer would involve a grave hazard of financial injury to the exchange or the firm's creditors. Cf. Intercontinental Industries, Inc. v. American Stock Exchange, *supra* 452 F.2d at 940.

Here, W & B admittedly was aware of the charges against it and it does not and cannot dispute that it was in violation of the net capital requirements of the NYSE and ASE. The only procedural defect about which W & B appears to complain is the failure of defendants to allow it to be heard on the charges against it. However, except to point out that the situation of Ira Haupt & Co. was considerably more serious than its own, W & B has offered no evidence to refute the seriousness of its own condition.[19] Moreover, it is undisputed that as soon as W & B was able to comply with the net capital requirement, it was promptly reinstated. The SEC has stated this is all that is required.[20]

▪ The exigency of the situation confronted by the Board of Governors makes it impossible for this Court now to say that summary suspension was unwarranted. Cf. Cowen v. New York Stock Exchange, 371 F.2d 661, 663–664 (2d Cir. 1967). The courts should be reluctant to substitute their hindsight judgment for that of those responsible for maintaining the integrity of the industry,[21] and should do so only where persuaded by much clearer evidence of unfairness than has been suggested here.

"We believe that if an Exchange utilizes fair and adequate procedures in affording the suspended member a prompt opportunity to demonstrate the propriety of reinstatement, due process requirements will be satisfied and the rights of the member as well as of [its] customers and the Exchange will be protected."

18. The immediacy of the situation makes this case distinguishable from Silver, *supra* note 6, which found that under the circumstances of that case lack of notice and hearing were inexcusable. In Silver petitioners sought, but were thwarted in all attempts, to learn why their private wire connections had been terminated.

Moreover, there was no evidence that affording the petitioners in Silver notice and a hearing could possibly pose any danger to the Exchange or the investing public.

19. W & B contends that its ability to raise enough capital to comply with the net capital rule within two days is evidence that suspension was unwarranted. This claim is specious. Antitrust liability does not attach merely because a court determines that it would have reached a different decision.

20. In questions put by the staff of the Senate Study, *supra* note 12, to the SEC, Securities Investor Protection Corp., and the NYSE, it was replied:

21. See House Study, *supra* note 9; Zuckerman v. Yount, 362 F.Supp. 858, 863 (N.D. Ill.1973).

Recently, in Rich v. New York Stock Exchange, 379 F.Supp. 1122 (S.D.N.Y.1974) the Court indicated that an exchange could be held liable to an injured party for failure to enforce its net capital rule,

"if plaintiff demonstrates that the Exchange had reason to believe or suspect that a member firm was in violation of the rules, and then failed or refused to take remedial action . . . ." 379 F. Supp. at 1126.

There appears to be no genuine issue of material fact to be tried. Rule 56, F.R.Civ.P. Even when plaintiff's allegations are viewed in the light most favorable to it, Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962), its complaint fails to state cause of action on which relief can be granted.

■ I conclude that since enforcement of the net capital rule is essential to the purposes of the Securities Exchange Act, and since the action of the Exchanges in the present instance satisfied constitutional standards, the Exchanges are immune from antitrust liability.

■ Little has been suggested to impose liability on the Clearing Corporations. It has not been disputed that they acted in accordance with their respective Rules and By-laws, and in good faith. In view of the nature of the operation of the Clearing Corporations and their necessary reliance on the Exchanges for financial information about clearing members, they cannot be held liable for relying upon the lawful acts of the Exchanges.

The Complaint therefore must be dismissed.

So ordered.